Filed 5/10/16  P. v. Lopez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ISRAEL EDUARDO LOPEZ et al.,<br><br>    Defendants and Appellants. | H039476<br>(Santa Clara County<br>Super. Ct. No. CC809481) |

Defendants Israel Eduardo Lopez and Richard Orestes Guerrero were convicted by jury trial of first degree murder (Pen. Code, § 187),[1] shooting at an occupied dwelling (§ 246), and assault with a firearm (§ 245, subd. (a)(2)).  The jury also found true gang enhancement allegations (§ 186.22, subd. (b)(1)(A), (b)(1)(B), (b)(1)(C)) as to the murder and shooting counts, and firearm enhancement allegations (§§ 12022.5, subd. (a), 12022.53, subd. (d)) as to all three counts as to Lopez and as to the murder and shooting counts as to Guerrero.  Lopez and Guerrero were each committed to state prison for a term of 50 years to life.

On appeal, Lopez claims that reversal is required because his confession, which was admitted into evidence at trial, was involuntary.  He also contends that the trial court prejudicially erred in failing to eliminate the final bracketed sentence in CALCRIM

---

[1]      Subsequent statutory references are to the Penal Code unless otherwise specified.

No. 358 concerning viewing oral admissions with caution. Lopez also claims that the firearm enhancement on the shooting count was not supported by substantial evidence. Guerrero asserts that his trial counsel was prejudicially deficient in asking a question during his cross-examination of a coparticipant that opened the door to the admission of highly incriminating prior inconsistent statements by the coparticipant, which previously had been ruled inadmissible. Both defendants argue that the assault with a firearm count was not supported by substantial evidence and that there were errors in the abstracts. The Attorney General concedes that the errors in the abstracts must be corrected. We accept the concession. As to Lopez, we reject his other contentions and affirm the judgment. As to Guerrero, we find that Guerrero's trial counsel was prejudicially deficient and reverse the judgment.

## I. Factual Background

Varrio Sur Town (VST) is a Sureno criminal street gang. It is the largest Sureno subset in the City of San Jose. There are about four times as many Norteno gang members in San Jose as there are Sureno gang members. VST associates itself with the color blue, and its rivals are "Norteno gang members in general," who associate themselves with the color red. Criminal street gang members believe that "[w]earing rival gang colors in another gang's claimed territory" constitutes "disrespect." They consider "disrespect" a reason "to retaliate with violence . . . ."

Lopez and Guerrero were VST members in March 2008.[2] Guerrero's nickname was "Sapo."[3] Miguel Calzada, Jonathan Osequeda, and Arturo Tadeo-Hernandez were

---

[2] Lopez had the word "Sureno" tattooed on his back.

[3] Guerrero had "SUR" tattooed on his stomach and VST tattooed on his back.

2

also VST members at that time. Guerrero was one of the "shot callers" for VST. Only a shot caller has the authority to "cancel something like a pending discipline" by the gang.

Homer Resendez had been friends with Jasmine Navarro and her boyfriend, Paul Hernandez, for about three months as of March 2008. The three of them occasionally used methamphetamine together. Hernandez was a VST member. Resendez was affiliated with the Norteno gang, and he had a Huelga bird tattoo on his neck and other Norteno tattoos. A Huelga bird is a symbol associated with Nortenos. Resendez lived in the area that VST claimed as its territory, and he had been seen more than once on his porch wearing red attire.

Navarro was warned that she and Hernandez should not hang out with Resendez because Resendez was "a northerner." Three weeks before March 19, 2008, Navarro received another warning about associating with Resendez from a female friend. Navarro ignored these warnings because she "come[s] from a family of very big gang members, . . . [and] [t]hey deal with that for me."

Two weeks before March 19, 2008, Hernandez was warned by a friend who was a VST member and two other VST members that Hernandez should avoid Resendez because he was "a Norteno." Hernandez was threatened with a beating if he did not heed this warning. Hernandez told his friend that he wanted "to call my friend Sapo [(Guerrero)]."[4] Hernandez and Guerrero had been friends for five years. Hernandez called Guerrero on the phone and asked Guerrero to tell "these guys" "I'm not doing nothing wrong." Guerrero agreed to do so, but he told Hernandez to "stop hanging out with him [(Resendez)] because it's causing problems for me."

---

[4] Hernandez testified at trial that Guerrero was not an active member of VST and did not participate in VST gang activities.

3

Resendez, his wife Elaine, and her son, Anthony Jordan, lived in a townhouse at 3685 Cape Cod Court. The townhouse was a two-story "end unit" on a four-unit building, and its front door faced Cape Cod Court, which is a cul-de-sac. Elaine was disabled, and Jordan was her caregiver. There was a "fairly long" wheelchair ramp leading up to the front door of the townhouse. The townhouse's windows were on the sides; there were no ground level windows on the front of the townhouse.

On March 19, 2008, shortly before 9:00 p.m., Resendez was sitting on the front porch in front of the townhouse in a rocker. He was wearing a red hat despite the fact that Elaine had warned him that it was not "a good idea" for him to wear red clothing in their neighborhood. A gold, four-door Honda drove up nearby. Elaine's granddaughter, Pocahontas Rivera, who was visiting them that evening, was sitting inside the townhome at a computer table, and Elaine was lying in bed near the computer table when they began to hear gunshots. Jordan was upstairs watching a hockey game. Rivera, Jordan, and Elaine heard at least five gunshots. Rivera got up and moved toward Elaine, and they saw a bullet come through the townhome. The bullet, which came through at a height of about four feet, would have come close to Rivera's head if she had not gotten up just before it flew by.

Resendez came in the front door, took two steps, and fell to the floor. The gold Honda was seen speeding away. Resendez had suffered three gunshot wounds. Two of the wounds were to the right side of his back, and the third was to his left forearm. One of the bullets remained in his body. That bullet had struck him in the back, likely while he was hunched over. This bullet wound would have been fatal by itself; the other bullet wounds were "potentially survivable."

Six hollow point bullets had been fired. One bullet remained lodged in the townhome's door. Two bullets had penetrated into the living room through the door. One had landed on a bookcase that was against the front wall of the townhome. The

4

other had travelled across the computer desk at a height of three feet and come to rest on the floor behind the desk. This bullet had entered the townhome at a height of about four feet. A fourth bullet had penetrated the door frame and lodged there. A fifth bullet was found lying on the ground near the front porch. The sixth bullet was the one that remained in Resendez's body. Five of the six bullets had been fired by the same revolver. The remaining one had been fired by a different gun.

Three young men were seen running across Hammond Park together at about 9:00 p.m. Hammond Park is about a mile and a half away from Resendez's townhome. The gold Honda, which had been stolen earlier that day, was found abandoned just before 10:00 p.m. on March 19, 2008 with its engine still warm in front of a house by Hammond Park.

The police confiscated the Honda. Two soda cans and a soda bottle were found in the Honda, and the Honda and the cans and bottle were dusted for fingerprints and swabbed for DNA. Jonathan Osequeda's fingerprint was found on one of the soda cans. In April 2008, a warrant was issued for Osequeda's arrest for auto theft. Arturo Tadeo-Hernandez's DNA was found on the Honda's steering wheel. On May 15, 2008, a car driven by Guerrero was stopped in Santa Cruz. Osequeda and Miguel Calzada were passengers in the car. After it was discovered that there was a warrant for Osequeda's arrest, he was arrested. Neither Guerrero nor Calzada was arrested. On June 11, 2008, the police saw Lopez drive up and park in front of Guerrero's home at 8:35 p.m. Lopez sat in his car for five to 10 minutes, ate some food, and then drove away.

Lopez and Calzada were both arrested on June 20, 2008 and interviewed by the police. Lopez was interviewed by the police for a total of about two hours and 45 minutes interspersed over a seven-hour period. Up until the third segment of the interview, Lopez denied any involvement in the killing of Resendez. During the third segment, Lopez admitted that he had been told to kill Resendez, and that he had fired five

5

shots at Resendez. He explained that he was putting in work for VST by killing Resendez so that he could move up in the gang. Lopez said that a Sureno could "earn a star" by killing a Norteno. Lopez refused to name anyone else who had been in the Honda and insisted that he had been the only one who fired any shots. Shown a photograph of Guerrero, Lopez denied knowing him. However, he conceded that he "hung out" with Osequeda and Tadeo-Hernandez.

Calzada initially denied any involvement in the shooting of Resendez, but he eventually admitted to the police that he was in the Honda when the shooting occurred. He denied firing a weapon. Calzada told the police that Lopez was one of two shooters and that Lopez had fired four or five shots. He also told the police that Tadeo-Hernandez was the driver of the Honda. Calzada admitted that they had gone to Hammond Park after the shooting. He said that the murder was "Surenos putting in work."

After the third segment of the police interview, Lopez was put in a room with Calzada, and their conversation was recorded.[5] Lopez told Calzada that he had told the police "[t]hat I did it." He explained to Calzada that he had told the police that he was the only shooter and that he had fired five times. Lopez also told Calzada that the police had tried to get him to say that Guerrero had told him to commit the murder, but he had refused to tell them that. After saying to Calzada, "Hopefully they don't give too much time," Lopez said "But why'd they look for us to do it fool." Calzada responded: "Who?" Lopez replied: "Sapo [(Guerrero)]." Calzada responded: "Because he knew (inaudible). Yeah. At that time we were the only ones that (inaudible) (Inaudible)." Lopez replied: "Why the fuck do we do it?"

---

[5] A video of this conversation was played for the jury.

6

Guerrero lived with his brother Harry in Sunnyvale.[6] Their residence was a three-bedroom house with a detached garage containing a bedroom. Harry and his two children resided in the main house. Guerrero lived in the bedroom in the garage.

On October 8, 2008, the police obtained an arrest warrant for Guerrero and a search warrant for the Sunnyvale house. On October 10, Guerrero was arrested at the Sunnyvale house. Frederick Arcado (sometimes referred to as Frederick Hurtado), a Sureno gang member, was also present at the home when the search warrant was served. Guerrero worked for Dish Network installing satellite dishes, and his "Dish Network" "employee badge" was found in the bedroom in the garage.[7] Sureno gang indicia was also found in Guerrero's bedroom. A backpack was found on top of a suitcase on a high shelf in the garage. The backpack contained a .357 Magnum revolver wrapped inside of a rolled up polo shirt bearing a "Dish Network" logo. Five of the six bullets fired at Resendez had been fired by this revolver. The six-shot revolver was not loaded. The gun was examined for fingerprints and swabbed for DNA, and the shirt in which it was wrapped was submitted for lab testing. No identifications could be made of any fingerprints or DNA on the gun. Guerrero and Arcado were possible contributors to the DNA found on the shirt in which the gun was wrapped. Arcado's DNA was also found on a separate item inside the backpack. Arcado was a friend of Guerrero who frequently stayed with Guerrero and had been seen wearing one of Guerrero's Dish Network shirts.

## II. Procedural Background

Lopez and Guerrero were originally charged by an information that also charged Tadeo-Hernandez and Calzada with all three counts. An amended information added an

---

[6] Harry had been in a Norteno gang when he was younger.

[7] Harry also worked for Dish Network.

7

accessory (§ 32) count as to Guerrero, a voluntary manslaughter (§ 192, subd. (a)) count as to Calzada, and a conspiracy (§ 182, subd. (a)(1)) to commit assault with a firearm count as to Tadeo-Hernandez. The accessory count was subsequently dismissed by the prosecution in the interest of justice. Before Lopez and Guerrero were tried, Calzada pleaded no contest to the voluntary manslaughter count and admitted a gang enhancement allegation, and Tadeo-Hernandez pleaded no contest to the conspiracy count and admitted a gang enhancement allegation.

The prosecutor's theory was that Guerrero was "a shot caller" for VST who had ordered the killing of Resendez. He asserted in opening statement that Calzada and Lopez were the two shooters who shot at Resendez.

Guerrero testified at trial on his own behalf. He was 39 years old at the time of trial, and he admitted that he had been "in and out with Surenos since I was 14, but I didn't became [*sic*] a member [of VST] until I was 19." In the 1990's, he was convicted of several gang crimes. Guerrero claimed that he left VST in 1997 by being jumped out. Yet he continued to consider himself a Sureno. He worked for Dish Network as an installer from 2001 or 2002 until his arrest in October 2008. Guerrero claimed that he had never heard of Resendez prior to his arrest and had nothing to do with Resendez's death. Guerrero denied having ever met Lopez to his knowledge prior to his arrest. The first time he met Calzada was when Calzada was arrested in Santa Cruz. He also claimed that VST had never had a leader. Guerrero testified that Arcado sometimes stayed at Guerrero's home in 2008, and he gave Arcado "a couple" of his Dish Network shirts to wear. Guerrero denied that he had ever seen the backpack in which the gun was found.

The jury returned guilty verdicts on all three counts as to both defendants and found true the enhancement allegations except the gang enhancement allegation as to the assault with a firearm count. The jury hung on that allegation, and the prosecution dismissed it. The court imposed statutorily mandated 50 years to life sentences on both

8

defendants for the murder count and its enhancements.  The court imposed concurrent terms for the other counts.  Both Lopez and Guerrero timely filed notices of appeal from the judgments.

### III.  Discussion

### A.  Lopez's Confession

Lopez contends that the trial court prejudicially erred in denying his motion to suppress his confession as involuntary.

### 1.  Lopez's Police Interview

By the time Lopez was arrested, the police had information that Lopez and Calzada had been the shooters responsible for killing Resendez.  Lopez, who was 18 years old at the time, was arrested at about 8:00 a.m. on June 20, 2008, when he arrived for work at the pizza place where he worked as a dishwasher.

San Jose Police Officers Pete Ramirez and Anthony Mata began interviewing him at around 10:40 a.m.  Lopez had been handcuffed before the interview began, but he was immediately unhandcuffed when the officers entered the interview room.  At no point during the interview did the officers display their weapons, yell at Lopez, or threaten him.  After photos were taken of Lopez's tattoos, the officers offered him water or a soda and advised him of his constitutional rights.  Lopez acknowledged that he understood his rights, and he did not invoke them.

Throughout the first segment of the interview, which was video-recorded, Lopez appeared alert and comfortable, and he consistently responded to the officers' questions.  He leaned back in his chair, stretched his legs out, and generally held his hands together in his lap.  He smiled and laughed when the officers said something amusing.  Lopez yawned at times, but he did not appear to be sleepy.  He blinked his eyes a fair amount, and, in response to the officers' inquiries, said he needed "eye drops."  Lopez was

9

wearing a white jumpsuit that crinkled when he moved, but he did not appear to be particularly uncomfortable in it.

Ramirez told Lopez that "based on our conversation, it's going to be up to you to make certain decisions as to what you want to do and - and how this is going to play out." The officers showed Lopez a number of photos, and Lopez acknowledged that he knew Osequeda, Tadeo-Hernandez, and Calzada. He said that he and Calzada had been friends for four or five years. He admitted that he had been a member of VST for two years. He also admitted that he had "heard" that a man had been shot on Cape Cod a couple of months earlier. Mata and Ramirez suggested that the man who was shot "wasn't an angel," might have "pissed someone off or whatever," and "was hitting up on the young girls in the neighborhood . . . [and] doing other stuff that - that you shouldn't be doing." Ramirez explained that they were "trying to figure out who did what and who's responsible for what and who was just at the wrong place at the wrong time." Mata added "because there's different level of responsibility, accountability, you know, so . . . ." Ramirez then added: "And for us, that makes a huge difference."

Ramirez noted that the shooting might have been "an accident," or it might have been "planned for months and months and months . . . ." He told Lopez that the police had recovered the car used in the crime and asked Lopez "would there be any reason for your fingerprints or any - anything of yours to be in that car?" Lopez said "No" and explained that he stayed away from cars that might be stolen. Ramirez asked Lopez if there was anyone "that would lie about you and get you involved in something that maybe isn't true?" Lopez replied affirmatively, and Ramirez told him that "they're saying that you're involved in this thing." Ramirez suggested that "maybe you were just there and didn't know what was happening, maybe somebody took it upon themselves to do something crazy and you said, 'Oh fuck, what'd you do that for?'"

10

Lopez asked them "why'd you guys come to me?" Ramirez told him that "they told us . . . that you were involved and you were there when it happened," and "they gave us a lot of details." He told Lopez that Lopez's "friends" were "pointing the fingers at you." Lopez denied knowing Guerrero, but he admitted that he had "heard of him." Ramirez encouraged Lopez to tell them about his involvement. "[W]e can go to the DA and say, 'Hey uh, he was - he was cooperative with us, he was sorry for what happened out there, he didn't mean to get involved in this, he was in the wrong place at the wrong time.' And that's something I can tell - I can go [*sic*] the DA and talk to about this." He told Lopez that "you're looking at possible prosecution for murder." Ramirez explained that he wanted to know "who pulled the trigger" and "who was just there as a passenger that didn't do anything." "I think the best thing for you to do is just kind of lay it out, explain it, let us - let us take the information to the district attorney."

Lopez insisted that he had only heard about the shooting a couple of days later from a fellow VST member. Lopez told the police that he knew Osequeda had been arrested in connection with the shooting on Cape Cod. Ramirez asked Lopez if he thought that "the person that actually did the shooting and took it upon himself to go do that [should] be punished more severely than the person that was just in the car or just driving?" Lopez said he didn't know. Ramirez talked more about the difference between a person who just happened to be in the car and those who did the shooting or planned the shooting. "Very different things and - and- see for us, it's more important to make sense of things, more important to find out everything. If - if it was a plan then - then you know what? Then just - it gets laid out and then we present it to the district attorney and say 'Hey, this person was very cooperative with us, he laid it out, you know? He wants to do the right thing.' As opposed to somebody that - that comes in and lies and lies and lies, doesn't accept any kind of responsibility . . . then that's very difficult for us to - to present that."

11

Ramirez told Lopez: "We know you were there." Mata said: "And you know there's cameras on San Tomas." "And you know, and someone got caught." Lopez admitted that he had been to Hammond Park. Mata told him that "there's witnesses" and "[a] lot of the evidence was found there too." "You got a whole life in front of you, okay? This may be like a decision that, you know, that you have to make." Ramirez told Lopez that "it's the big guys that roll on everybody." He offered Lopez food, but Lopez said "I just ate at work." Lopez continued to deny any involvement and to insist that he had told the officers "everything I know." He said "you can do tests and anything you want," and he volunteered to take a polygraph.

Eventually, after Ramirez and Mata both said they were hungry and asked again if he was hungry, Lopez said he was a "little bit" hungry. Mata and Ramirez offered to get Lopez some crispy chicken and a soda, and Lopez accepted. The officers left the room, and Lopez yawned, stretched, and several times put his head down on the table for a minute or more. He appeared more bored than sleepy. Lopez also fiddled with the wristbands of the jumpsuit and carefully examined his fingernails. He eventually stood up, went to the door of the interview room, knocked, and asked to go to the bathroom. Lopez was swiftly taken to the bathroom. He returned a couple of minutes later. Ramirez returned about 25 minutes after he had left with a plate of food and a soda for Lopez. Ramirez continued to talk with Lopez while the two of them ate lunch for about 45 minutes to an hour.[8]

After lunch, Mata continued the interview, at first alone. Lopez continued to insist that "I told you everything that I know." Mata told him "you understand that we know that you're the one that shot?" Lopez continued to deny knowing Guerrero although he

---

[8] The appellate record contains no video or transcript of the conversation during lunch. Calzada was arrested after lunch. After lunch, the officers put Calzada and Lopez in a room together for about 30 to 40 minutes.

12

admitted that he had "seen him around." Mata told Lopez that he knew that Lopez "showed up to his [(Guerrero's)] house in Sunnyvale" "last week." Lopez denied it. Mata told Lopez that he was "gonna be booked" for "murder." He asked Lopez if he wanted to call his mother, but Lopez declined. Mata told Lopez: "We know it came from the top. I mean but just to sit there and just throw away your whole life, you know, for the cause, for the homies, I mean that's - that's the decision you're making. . . . Don't you, you know, have any questions or you think oh fuck, you know, better tell what happened so I can help myself out? That . . . that's what we're trying to do, just trying to help you out even though you might not think that, Israel. But the bottom line is, if you lay it out the way it happens, your . . . involvement, like we told you, there's different levels of involvement. Yeah, we have to write it down and then give it over to the District Attorney and then they decide what they want to do. I mean . . . if we give 'em what you told us . . . people are gonna think that you know what? Israel's not remorseful. He don't care. You know, he embraced that - that thug life or that gangster life. And you know what? We'll just give him whatever. But if they . . . see that you're remorseful that you know what? Yeah I fucked up. . . . That goes a long way. . . . And you know what? What's done is done. What happened, happened. And you're gonna move on. I mean you're still young. You're only 18. Okay you got - you still have a whole life in front of you. Obviously, yeah just this little stumbling block here. I mean it's a major one 'cause it's something serious. Yeah, it's gonna set you back a little bit. But I know just by looking at you that you'll learn from this."

"We only want to hear your side, what you did, your involvement. Because you know all it is is right now everybody's finger pointing." "[W]e wouldn't be here talking with you right now, all right, without giving you an opportunity to say hey, you know what? Yeah I fucked up. It was something stupid I did. It's time to move on. This is what happened. And go from there. I mean you - I mean none of us - now I can't sit here

13

and promise you anything. And I - and you know that." "But the thing is is you have to do it for yourself. I mean you have to say you know what? I'm decide [*sic*] to be honest. . . . [O]bviously if we didn't care about you, Israel, we would just have those guys and brought you in just after we talked to you, lock you up." "You know, we tell you straight out hey this is what we have. Help us try to explain that. . . . But the thing is we want to know why this happened. . . . I can throw out all kinds of possibility [*sic*] or reasons why. But I don't know 'cause I wasn't there. I wasn't part of that. You were. Help us help you, Israel. . . . The only way you'll get some closure out of this is by getting all that stuff off your chest and just telling us hey, you know what? You're right. I fucked up. This is the reason why we did it. And this is my involvement."

Mata asked Lopez: "Are you afraid to tell us, Israel?" Lopez responded: "What difference does it make?" Mata told him: "It makes a lot of difference." "Because it's gonna be the difference between you not saying anything, be a hardass straight up gangster, cold-blooded killer and someone who had remorse, okay? Someone who - who, like I told you, who feels sorry for what they've done. Of course that makes a different [*sic*]. Peo - people see that. And people who don't give a fuck and just go hey you know what? Fuck it, just roll with it. Those are hardcore motherfuckers, right? In the - when they go to - through the whole process and everything they say yeah this guy's - he don't give a fuck. He don't give a shit about anything. Well when they say, you know what? Yeah, they see something and they say you know what? I did fuck - I fucked up. And you know what? This is what I did, this is my involvement, we just go from there. You - if you don't believe me, people do look at that so it does matter. That's why I'm asking you if - if someone threatened you or your family, you know, that's something you need to tell us as well."

14

Lopez responded: "No. No just (unintelligible) jale."[9] "[J]ale" refers to "putting in some work" for the gang. At this point, the officers left the room and returned a few minutes later with sodas for all three of them. They asked Lopez whose decision it was, and he said he "was just trying to prove myself," and "someone asked and they came to me," and "you know, you can't back down." He refused to disclose the identity of the person who had asked him to do it. He admitted that someone had stolen the car that was used in the killing of Resendez. Lopez told the police that there were two other people in the car when he was picked up, but he refused to identify them and insisted that he was the only shooter and the only one who got out of the car. He said he shot about five times after the victim said " '[w]hat's up.' " He claimed that "[i]t wasn't meant to kill . . . it was just meant to scare." Lopez said that he "didn't keep" the gun. After Lopez had begun confessing, he began fiddling with the jumpsuit, and Ramirez suggested that he pull down the top of it, which he did. Lopez had not mentioned any discomfort earlier.[10]

### 2. Proceedings Below

Lopez's trial counsel moved in limine to exclude Lopez's confession as involuntary. He argued that the officers had lied to Lopez about the evidence that they had against him. He also contended that Lopez would have understood the statements by the police to mean that "there was a penalty for silence" and that "his cooperation" would lead to "leniency." Lopez's trial counsel conceded that the officers never "specifically" told Lopez that his cooperation would "result in a more lenient punishment." At the Evidence Code section 402 hearing on Lopez's motion, the officers testified that they did not make any promises or offer Lopez leniency if he cooperated. The defense presented

---

[9] Once he began confessing, Lopez became slower to respond to the officers' questions and began avoiding eye contact.

[10] After Lopez confessed, he was again put in a room with Calzada.

15

an expert witness on the voluntariness of confessions.  The trial court discounted the defense expert's testimony and found that Lopez's confession was voluntary.[11]

The prosecutor told the jury in opening statement that Lopez had confessed to shooting Resendez.  A video of Lopez's confession was played for the jury.  Lopez's trial counsel argued to the jury that Lopez's confession was false and "the product of psychological coercion . . . ."  "[I]t was probably some kind of combination of fear, coercion, exhaustion and the implied other threats that [the police] communicated to him coupled with implied promises of leniency that he received."  He contended that Lopez had confessed in order to "be a hero to his home boys" by "tak[ing] the weight off everybody else . . . ."  "[H]e confessed to something that didn't happen, to firing all the shots himself when we know that that couldn't possibly be true."  During deliberations, the jury asked for and received individual copies of the transcript of Lopez's confession.

### 3.  Analysis

Lopez claims that his confession was inadmissible because it was involuntary.

An involuntary statement is inadmissible.  " ' "A statement is involuntary if it is not the product of ' "a rational intellect and free will." ' [Citation.]  The test for determining whether a confession is voluntary is whether the defendant's 'will was overborne at the time he confessed.' " ' " [Citations.]  [¶]  ' "A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence. [Citation.]  Although coercive police activity is a necessary predicate to establish an involuntary confession, it 'does not itself compel a finding that a resulting confession is involuntary.' [Citation.]  The statement and the inducement must be causally linked. [Citation.]" [Citation].' [Citation.]  A confession is not rendered involuntary by coercive police activity that is not the 'motivating cause' of

---

[11]     The court allowed his trial counsel's objection to be a continuing one.

the defendant's confession.  [Citation.]  'The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made.' [Citation.]  'Whether a confession was voluntary depends upon the totality of the circumstances.'  [Citations.]  'On appeal, we conduct an independent review of the trial court's legal determination and rely upon the trial court's findings on disputed facts if supported by substantial evidence.'  [Citation.]  The facts surrounding an admission or confession are undisputed to the extent the interview is tape-recorded, making the issue subject to our independent review."  (*People v. Linton* (2013) 56 Cal.4th 1146, 1176-1177.)

Lopez identifies several considerations that he argues rendered his confession involuntary.  First, he claims that the officers made implied offers of leniency by suggesting that he would be treated more leniently if he were remorseful and asking him to "help us help you."  Second, he contends that the officers lied to him about the evidence that they had against him.  Third, Lopez maintains that the totality of the circumstances of the interrogation (including its length, its location, and the fact that he was required to wear an uncomfortable jumpsuit) were coercive.

We do not agree with Lopez that the officers made any implied offers of leniency. "'[W]here a person in authority makes an express or clearly implied promise of leniency or advantage for the accused which is a motivating cause of the decision to confess, the confession is involuntary and inadmissible as a matter of law.'  [Citation.]  'A confession is "obtained" by a promise . . . if and only if inducement and statement are linked, as it were, by "proximate" causation. . . .  'This rule raises two separate questions:  was a promise of leniency either expressly made or implied, and if so, did that promise motivate the subject to speak?'  [Citation.]  To answer these questions '"an examination must be made of 'all the surrounding circumstances—both the characteristics of the accused and

17

the details of the interrogation.' " ' [Citation.]" (*People v. Tully* (2012) 54 Cal.4th 952, 985-986.)

A police officer may properly suggest that the crime "might have been an accident, a self-defensive reaction, or the product of fear" without being coercive since such suggestions are merely "possible explanations of the events" that provide a defendant with an opportunity to provide details. (*People v. Carrington* (2009) 47 Cal.4th 145, 171 (*Carrington*).) And a statement by a police officer "that he would inform the district attorney that defendant fully cooperated with the police investigation did not constitute a promise of leniency" so long as the officer did not "suggest [he] could influence the decisions of the district attorney, but simply informed defendant that full cooperation might be beneficial in an unspecified way." (*Carrington*, at p. 174.) Such statements are not improper because "the particular circumstances of a homicide can reduce the degree of culpability, and thus minimize the gravity of the homicide or constitute mitigating factors in the ultimate decision as to the appropriate penalty." (*Carrington*, at p. 171.)

The statements made by Mata and Ramirez concerning the potential benefit to Lopez of telling them of his involvement never suggested anything more than that "cooperation might be beneficial in an unspecified way." During the portion of the interview before lunch, the officers told Lopez that they were trying to figure out "who did what and who's responsible for what" because each person's "level of responsibility" "makes a huge difference." They suggested that he might have been present during the shooting but not known what was going to happen, or the shooting might have been an accident. And they told Lopez that if he would "lay it out" and "explain" his involvement, they would "take the information to the district attorney" and tell the district attorney that Lopez had been "very cooperative" and "wants to do the right thing." They contrasted that with someone who "lies, doesn't accept any kind of responsibility . . . then

18

that's very difficult for us to - to present that [to the district attorney]." Despite these entreaties, Lopez continued to deny any involvement throughout this segment of the interview. While the statements of the officers suggested that cooperation might make some unspecified "difference," none of these statements exceeded the bounds of *Carrington*.

During the segment of the interview after lunch, Lopez continued to deny any involvement even after Mata told him that he was "gonna be booked" for "murder." Mata again urged Lopez to explain his level of involvement so that the police could "write it down and then give it over to the District Attorney and then they decide what they want to do." He told Lopez that if he continued to deny any involvement, "people are gonna think" that he was "not remorseful," "don't care," and had "embraced . . . that gangster life," and "[w]e'll just give him whatever." His remorse "goes a long way." Mata told Lopez: "[Y]ou still have a whole life in front of you. Obviously, yeah just this little stumbling block here. I mean it's a major one 'cause it's something serious. Yeah, it's gonna set you back a little bit. But I know just by looking at you that you'll learn from this." Mata urged Lopez to let them "hear your side, what you did, your involvement." Mata told Lopez: "I can't sit here and promise you anything. And I - and you know that." Lopez acknowledged this.

Lopez claims that Mata's statement that Lopez's denial would make "people . . . think" he was not remorseful and "just give him whatever" was a false statement that a remorseful killer would receive a lesser sentence than an unremorseful killer. We cannot credit this interpretation of Mata's remarks. Mata made it clear to Lopez that the district attorney would "decide what they want to do" and that the police "can't . . . promise you anything." Since Mata was clear that he was not speaking for the district attorney and had no capacity to make any promises to Lopez, Mata's statements are logically construed as a common sense assessment of how "people" in the community

19

might view an unremorseful killer. Lopez had not yet provided any explanation of his involvement, and Mata's statements, in the context of his various suggestions that those involved in the crime might have different levels of involvement, were not inaccurate. The punishment for an accidental killing or a killing by someone acting out of fear might well depend on the perpetrator's explanation for the conduct including his or her remorse. We find no implied offer of leniency in Mata's remarks.

During the final portion of the interview before Lopez confessed, Mata asked Lopez to "[h]elp us try to explain" what happened and to "[h]elp us help you . . . get some closure out of this . . . by getting all that stuff off your chest . . . ." Mata followed up this appeal by asking Lopez to "tell me what you're thinking about," and Lopez said "[m]y family." They proceeded to discuss Lopez's family, an incident during which he had been stabbed by a Norteno, and another incident in which a Sureno had been killed by a Norteno. At the end of this discussion, Mata asked Lopez if he was "afraid to tell us," and Lopez asked "[w]hat difference does it make?" Mata told him "it's gonna be the difference between you not saying anything, be a hardass straight up gangster, cold-blooded killer and someone who had remorse" and "feels sorry for what they've done." He urged Lopez that "people see that" and "people do look at that so it does matter." It was only after this exchange that Lopez confessed.

Lopez contends that Mata's statement "[h]elp us help you" was an offer by the police to provide leniency to Lopez if he confessed. "The line to be drawn between permissible police conduct and conduct deemed to induce or to tend to induce an involuntary statement does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police. . . . [¶] When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, we can perceive nothing improper in such police activity. On the other hand, if in addition to the

20

forgoing benefit, or in the place thereof, the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible. The offer or promise of such benefit need not be expressed, but may be implied from equivocal language not otherwise made clear." (*People v. Hill* (1967) 66 Cal.2d 536, 549.)

Lopez relies on *People v. Hogan* (1982) 31 Cal.3d 815 (*Hogan*), disapproved on another point in *People v. Cooper* (1991) 53 Cal.3d 771, 835, and claims that Mata's statement implied that he would be treated leniently if he confessed. In *Hogan* the police repeatedly suggested that the defendant needed mental health treatment and offered to help him obtain it. (*Hogan*, at pp. 835, 838.) A plurality of two justices of the California Supreme Court found that this was an implied offer of leniency that rendered the defendant's subsequent confession involuntary. (*Hogan*, at p. 838.)

*Hogan* is readily distinguishable.[12] Unlike the specific offer of mental health treatment in *Hogan*, Mata's reference to "help," taken in context, referred only to the benefit that naturally comes from a truthful statement. Mata had already told Lopez that any decisions would be made by the district attorney and that the officers lacked the power to make any promises, and Lopez had acknowledged as much. When the entire lengthy statement by Mata that included the "help us help you" remark is taken as a whole, it is clear that Mata was simply telling Lopez that Lopez could "help" both the

---

[12] *People v. Johnson* (1969) 70 Cal.2d 469 (*Johnson*) is also distinguishable. In that case, before the interviews, the defendant was told that his statements would be inadmissible in court. (*Johnson*, at p. 474.) The California Supreme Court reversed on the ground that the defendant had not knowingly and intelligently waived his constitutional rights. (*Johnson*, at pp. 473, 479.) Lopez does not challenge the validity of his waiver of his constitutional rights.

21

police ("us") and himself ("you") by explaining his involvement thereby achieving "closure" and "getting all that stuff off your chest." It was this "closure" that Mata posited would "help" Lopez. The only "benefit" that Mata offered Lopez was the benefit that naturally comes from "getting all that stuff off your chest."

Lopez's reliance on *Ramirez v. State* (Fla.Dist.Ct.App. 2009) 15 So.3d 852 (*Ramirez*) is misplaced. In *Ramirez*, the detective "never explained the limits of his authority," told the defendant " '[t]his is your only chance,' " "warned" the defendant "that the only way he could 'get out of this' was by telling the truth," told the defendant that he "could not explain what help he was offering because 'they' could not know he promised [the defendant] anything," and admonished the defendant that " '[y]our life right now is in my hands.' " (*Ramirez*, at p. 854.) The defendant then implicated himself. The Florida Court of Appeal found the defendant's statements involuntary because the detective's statements "strongly implied" that the detective would provide "some specific benefit" to the defendant in exchange for a statement. (*Ramirez*, at pp. 856-857.) In contrast, Mata explicitly told Lopez that he lacked the power to make any promises and never suggested that Lopez would receive any specific benefit for making a statement.

Lopez also points to Mata's statement that Lopez had his "whole life in front of you," with "just this little stumbling block here," that would "set you back a little bit." He claims that these statements misrepresented the fact that a confession to murder would put Lopez in prison for life. Mata's statements about Lopez's prospects took place during his plea to Lopez to explain the nature of his involvement. Without knowing Lopez's level of involvement in the killing, the severity of the "set . . . back" it would pose to Lopez's "whole life" remained unknown. As Lopez was just 18 years old, it was not deceptive to suggest that, depending on the level of Lopez's involvement, he could eventually surmount this obstacle. We also find nothing coercive in Mata's additional references to what "people" think about a person with remorse versus a person without

22

remorse.  As we have already discussed, these comments could not have been construed as an implied offer of leniency because Mata had already made clear that the district attorney's office would make the decision about the charges and that he had no power to make any promises.

Lopez claims that his confession was coerced because the officers lied to him by (1) telling him that his friends had fingered him, (2) implying that his fingerprints and "other stuff" had been found in the Honda, (3) telling him that a traffic camera had captured an image of the Honda and him in it, and (4) telling him that evidence had been found at Hammond Park.

"'Deception does not undermine the voluntariness of a defendant's statements to the authorities unless the deception is "'"of a type reasonably likely to procure an untrue statement."'"' [Citation.]" (*People v. Hensley* (2014) 59 Cal.4th 788, 813.)

Lopez argues that the officers' claim that "they" had implicated him was false because the officers had received information from just a single person.  The officers used the pronoun "they" repeatedly in referring to their source of information that Lopez was involved in this offense, but it was not clear that the officers were using "they" to refer to anything more than a single individual.  They also referred to the fact that "somebody's talking to us" and "people are saying that you were there when this happened," which was ambiguous about whether their source of information was one person or more than one person.  The officers also referred to their source of information as a single person when they told Lopez that "we have no reason to doubt *the person* that told us this stuff that you were there." (Italics added.)  We see no substantial deception here.  And even if Lopez might have understood the officers' references to "they" and "people" to refer to more than one person, this is not the type of deception that is likely to lead a person to falsely confess.  The implication that there are two accusations rather than one accusation does not make a false confession likely.

23

The officers never actually told Lopez that they had found his fingerprints or anything else of his in the Honda. They told him that they had carefully examined the Honda and asked him if his fingerprints or anything else of his could have been found in the Honda and what explanation he would provide if such evidence was found. This was not a lie, and it was not likely to produce a false confession. Similarly, the officers' statements about the red light camera did not actually assert that Lopez's photo had been captured. Lopez claims that the officers falsely told him that "a lot of evidence" had been found in Hammond Park. The officers did not say that. After a discussion about Hammond Park, they told Lopez that "there's witnesses, you know, that's where" and then said "[a] lot of evidence was found there too." Since the Honda was found next to Hammond Park, the officers' reference to "[a] lot of evidence" could have referred to the evidence found in the Honda. In any case, even a false claim that "evidence" of some kind was found in the park would not be likely to lead to a false confession because there was not even a suggestion that this evidence implicated Lopez.

There were no express or implied promises of leniency, and the alleged deceptions were neither individually nor as a group likely to produce a false confession. The circumstances of the interrogation were also not coercive. "In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused, [citation]; his lack of education, [citation]; or his low intelligence, [citation]; the lack of any advice to the accused of his constitutional rights, [citation]; the length of detention, [citation]; the repeated and prolonged nature of the questioning, [citation]; and the use of physical punishment such as the deprivation of food or sleep, [citation]." (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226.)

24

Contrary to Lopez's claim, the video demonstrates that the interview room was not uncomfortably small. The interview was not unduly prolonged, particularly since Lopez was provided with food, drinks, bathroom breaks, time alone, and time with Calzada between the interview sessions. Although Lopez yawned and put his head down at times, particularly when he was alone, the video demonstrates that he was not sleep-deprived during this middle-of-the day interview. It is true that he was just 18 years old, but he was already on probation and had been detained by the police before. We conclude that Lopez's confession was voluntary, and the trial court did not err in denying his motion to exclude it.

## B. CALCRIM No. 358

Lopez contends that the trial court prejudicially erred in including the final sentence of CALCRIM No. 358 in its instructions to the jury.

### 1. Background

The court instructed the jury with CALCRIM No. 358: "You have heard evidence that a defendant made oral statements before the trial. You must decide whether the defendant -- whether that defendant made any of these statements, in whole or in part. If you decide that a defendant made such statements, consider the statements along with all the other evidence in reaching your verdict. [¶] It is up to you to decide how much importance to give to the statements. Consider with caution any statement made by a defendant tending to show his guilt unless the statement was written or otherwise recorded."

The prosecution had requested CALCRIM No. 358, and Lopez's trial counsel had objected to the last sentence of the instruction. "[T]he negative pregnant of this tells the jurors . . . that you need not consider this statement with caution even though it's a confession because it's recorded. I think that's misleading and confusing. There's not

25

going to be any argument in the case as to what words were said by Mr. Lopez or whether they were said." The court pointed out that Guerrero had made statements that were not recorded thereby necessitating the final sentence of CALCRIM No. 358. Lopez's trial counsel then asked the court to give "two completely separate instructions of one applicable only to Mr. Lopez and one to Mr. Guerrero, where the one as to Mr. Lopez leaves out altogether the bracketed phrase and the one as to Mr. Guerrero includes in its totality the bracketed phrase."

The court rejected that request and modified the instruction to refer to "a defendant" and "that defendant," rather than "the defendant." The prosecutor referenced CALCRIM No. 358 in his argument to the jury: "Evidence of defendant's statements. That last sentence, you can really wipe it out for Mr. Lopez because his statements are recorded. [¶] Now, there are some statements of Mr. Guerrero's that are not. This is why the jury instruction is for you. But as to the things Mr. Lopez said, there's no requirement you consider them with caution because they are recorded."

## 2. Analysis

The sole purpose of CALCRIM No. 358 is to assist the jury in determining whether a statement was actually made by a defendant. (*People v. Diaz* (2015) 60 Cal.4th 1176, 1186, 1194-1195.) Consequently, there is no need for the cautionary instruction where a defendant's recorded statements are before the jury. Lopez's recorded statements were before the jury, so the jury was not required to view those statements with caution. CALCRIM No. 358, as given by the trial court, accurately related to the jury that it was *not* required to view Lopez's statements with caution.

Lopez claims the instruction was erroneous because it told the jury that it did not have to consider Lopez's statements with caution. However, this was an accurate statement of the law. Furthermore, none of the other options suggested by Lopez's trial counsel would have been better for Lopez. Guerrero's statements were not recorded, so

26

the court was obligated to instruct the jury to view Guerrero's statements with caution. Had the court given two separate instructions, the jury still would have been given the admonition to view Guerrero's statements with caution, and that admonition would have been omitted as to Lopez. The jury would clearly understand that it was not required to view Lopez's statements with caution. The trial court did not err in giving its modified version of CALCRIM No. 358.

### C. Firearm Enhancement On Shooting Count

Lopez contends that the firearm enhancement on the shooting count is not supported by substantial evidence.

### 1. Background

Lopez's trial counsel challenged the sufficiency of the evidence to support the submission of the shooting count's firearm enhancement allegation to the jury. The prosecutor pointed out that at least one of the bullets that went through Resendez's body also penetrated the townhouse. The court rejected Lopez's challenge.

The jury was instructed that an element of the shooting count was that "defendant shot the firearm at an inhabited house." As to the firearm enhancement allegation regarding the shooting count, the jury was instructed: "To prove this allegation, the People must prove that: [¶] 1. Someone who was a principal in the crime personally discharged a firearm during the commission of [the crime]; [¶] AND [¶] 2. That person intended to discharge the firearm; [¶] AND [¶] 3. That person's act caused the death of another person." The jury was told, in response to its question during deliberations, that the shooting count "does not require an intent to strike the building."

### 2. Analysis

Lopez contends that the "shooting of a firearm at an inhabited dwelling house did not proximately cause the death of Homer Resendez."

27

The firearm enhancement applies to "any person who, in the commission of a felony specified in subdivision (a), Section 246 [(shooting at an inhabited dwelling house)], or subdivision (c) or (d) of Section 26100, personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in Section 12022.7, or death, to any person other than an accomplice . . . ." (§ 12022.53, subd. (d).)

"Penal Code section 246 is a general intent crime. [Citations.] There is no requirement that the defendant intend to strike the building. [Citation.] As for all general intent crimes, the question is whether the defendant intended to do the proscribed act." (*People v. Jischke* (1996) 51 Cal.App.4th 552, 556.) "[S]ection 246 is not limited to the act of shooting directly 'at' an inhabited or occupied target. Rather, the act of shooting 'at' a proscribed target is also committed when the defendant shoots in such close proximity to the target that he shows a conscious indifference to the probable consequence that one or more bullets will strike the target or persons in or around it." (*People v. Overman* (2005) 126 Cal.App.4th 1344, 1356.) Section 246 is violated when "shots [are] directed primarily at persons standing close to a dwelling." (*People v. Chavira* (1970) 3 Cal.App.3d 988, 993.) The inhabited dwelling need only "be within the defendant's firing range." (*People v. Ramirez* (2009) 45 Cal.4th 980, 990.)

Lopez admitted that he personally and intentionally fired five shots at Resendez, who was on the townhome's front porch. The townhome was clearly within Lopez's "firing range" when he fired these shots, so Lopez's discharge of the firearm was plainly a violation of section 246. Since Lopez's discharge of the firearm (the commission of the section 246 offense) proximately caused Resendez's death, substantial evidence supported the jury's finding that Lopez personally and intentionally discharged the firearm and proximately caused Resendez's death in the commission of the section 246 offense.

## D. Assault With A Firearm Count

Both Guerrero and Lopez challenge the sufficiency of the evidence to support the assault with a firearm count. They claim that there was no evidence that the shooter "had actual knowledge of facts that would lead a reasonable person to conclude that someone was probably in the house at the time of the shooting . . . ."[13]

Assault is a general intent crime. (*People v. Williams* (2001) 26 Cal.4th 779, 788 (*Williams*).) "[A]ssault does not require a specific intent to cause injury or a subjective awareness of the risk that an injury might occur. Rather, assault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." (*Williams*, at p. 790.) The intent element is satisfied if the perpetrator is "aware of the facts that would lead a reasonable person to realize that a battery would directly, naturally and probably result from his conduct. He may not be convicted based on facts he did not know but should have known." (*Williams*, at p. 788.)

The evidence established that Lopez stood in front of the townhome and fired five shots from a revolver toward the front doors of the townhome where Resendez was sitting on the porch. The jury could have reasonably concluded that, due to his vantage point, Lopez could not have failed to be aware of three important facts. First, the townhome had a very long and obvious wheelchair ramp leading up to its front door, and Resendez was visibly not in a wheelchair. The presence of the wheelchair ramp, which Lopez was facing when he fired the revolver, showed that someone who used a wheelchair lived in the townhome with Resendez. Second, the size of the townhome would have been apparent to Lopez as he faced the townhome and fired the revolver.

---

[13] At trial, Lopez's trial counsel sought dismissal of the assault count on the ground that there was insufficient evidence that the shooter would have been aware that a human being was in the townhome. The court denied the request.

29

Lopez could not have failed to observe that the townhome had two stories and was substantial in size, which a reasonable person would have realized meant that more than one person lived there. Third, Lopez was aware that it was nighttime, which a reasonable person would have realized meant that a person who uses a wheelchair would be home.

Because a reasonable person aware of these three facts (the wheelchair ramp, the size of the townhome, and the time of night) would have realized that a person was inside the townhome, there was sufficient evidence that Lopez harbored the requisite intent for assault with a firearm. Accordingly, the challenge to the sufficiency of the evidence to support this count lacks merit.

## E. Ineffective Assistance

Guerrero contends that his convictions must be reversed because his trial counsel was prejudicially deficient in his cross-examination of Calzada and thereby opened the door to the admission of extremely damaging evidence against Guerrero that had previously been excluded.

### 1. Background

Lopez was arrested at 8:00 a.m. on June 20, 2008. Calzada was arrested at 12:35 p.m. on the same day. The two men were separately interviewed by the police and were also placed in a room together by themselves. Their conversation with each other was secretly audio and video recorded. The two of them discussed what the police had told them and what they had told the police. Lopez told Calzada that he had taken responsibility for the shooting. Lopez also told Calzada that the police had tried to get him to say that Guerrero had told him to commit the murder, but he had refused to tell them that. After saying to Calzada, "Hopefully they don't give too much time," Lopez said "But why'd they look for us to do it fool." Calzada responded: "Who?" Lopez replied: "Sapo [(Guerrero)]." Calzada responded: "Because he knew (inaudible). Yeah.

30

At that time we were the only ones that (inaudible) (Inaudible)." Lopez replied: "Why the fuck do we do it?"

Guerrero's trial counsel moved in limine to exclude as hearsay and under *Aranda-Bruton*[14] any out-of-court statements by nontestifying codefendants. Guerrero conceded that Lopez's admission to the police that he had killed Resendez was admissible against Guerrero as Lopez's declaration against interest. He argued that the conversation between Lopez and Calzada inculpating Guerrero was hearsay that was not admissible under the exception for declarations against penal interest (Evid. Code, § 1230).[15] He essentially conceded that these statements were nontestimonial. Guerrero's trial counsel argued that "there is no indicia of any declaration against penal interest here." He asserted that Lopez and Calzada were shifting the blame to Guerrero, which was not against their penal interest. Guerrero's trial counsel argued that the statement was not against Lopez's penal interest. Although he wanted the court to exclude statements inculpating Guerrero made by Lopez and Calzada during their recorded conversation, Guerrero's trial counsel asked the court to permit him to introduce statements exculpating Guerrero that Lopez and Calzada had made both to the police and to each other. Lopez's attorney suggested that the Lopez/Calzada statement implicating Guerrero could be redacted to eliminate the reference to Guerrero and to substitute "they."

The prosecutor opposed Guerrero's request to suppress this portion of the conversation between Calzada and Lopez. He claimed that the conversation was admissible as a declaration against penal interest and was not barred by *Aranda-Bruton*.

---

[14]     *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*) and *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*) concern the admission of a nontestifying codefendant's statements at a joint trial.

[15]     He also argued that this conversation was not admissible as admissions of coconspirators.

Admission of the conversation would not violate the confrontation clause (or *Bruton*) because the statements were nontestimonial. He argued that Lopez's statement about Guerrero was a declaration against penal interest because it demonstrated that Lopez had participated in a gang murder, which exposed Lopez to gang enhancements. He asserted that Guerrero's name was inculpatory because it tied Lopez and Calzada to the head of VST, which was an admission that the killing was a gang hit. The prosecutor opposed redaction. The prosecutor additionally argued that the conversation between Lopez and Calzada was admissible as statements of coconspirators (Evid. Code, § 1223).[16]

The trial court rejected the prosecutor's claim that the statements were in furtherance of a conspiracy: "[G]enerally, if the conspiracy is to kill someone and the person is killed, it's [*sic*] mission is accomplished and the conspiracy does not . . . continue beyond that." The trial court spent a lot of time considering the admissibility of the conversation between Lopez and Calzada, and it explained that it had "been wrestling with this." The court noted that "case law seems to make a distinction between shifting responsibility and sharing responsibility." The court's view was that the Lopez/Calzada statement "appears to be sharing responsibility," but it conceded that "it's a close question." The court initially tentatively concluded that the statement was admissible as a declaration against penal interest, but it agreed with Lopez's attorney that, "since it's coming in under a declaration against interest, that purpose can best be served

---

[16] The prosecutor also urged that a statement by Lopez to the police about returning the gun to the person who ordered the killing was a declaration against penal interest because it exposed Lopez to conspiracy charges. He argued that Lopez's statement to the police about the gun was admissible because it did not inculpate anyone and was in furtherance of the conspiracy. Guerrero's trial counsel argued that Lopez's statement to the police about the gun was inadmissible because it was testimonial and Lopez was not testifying at trial. The court found that Lopez's statement that he gave the gun back to the person who had given it to him was a declaration against penal interest, but it still kept that out because it was testimonial.

32

by redacting it . . . to eliminate the reference to [Guerrero]." It ultimately concluded that this statement was nontestimonial and that it was a declaration against penal interest that was trustworthy. However, the court concluded that Guerrero's identity was not inculpatory of Lopez or Calzada so that portion of the statement was not against their penal interests and had to be redacted. "I don't agree that identifying the particular person who gave them the order redounds upon the person following the orders as opposed to the person giving it. And that portion would not be admissible, um, 'Who?' 'Sapo' under that hearsay exception." The trial court ruled that the recording of the Lopez/Calzada conversation would be redacted to eliminate Guerrero's name.

During a later portion of the in limine motions, Guerrero's trial counsel asked the court to rule admissible a portion of Lopez's confession during which Lopez denied he knew Guerrero and stated that Guerrero was no longer a member of VST. The prosecutor stated that he did not object to the admission of that evidence, but "I would, however, seek to impeach it" with "Lopez's statement that it was [Guerrero] that picked him to commit the crime which is directly impeaching if he doesn't know who [Guerrero] is." In response, Guerrero's trial counsel withdrew his request, saying "I can see that it's going to buy me more trouble than it's worth."

In opening statement, the prosecutor told the jury that the issue would be "[w]ho's this 'they' that picked Miguel Calzada and Israel Lopez and said go kill this guy, the 'they' that Lopez and Calzada talk about it?" Guerrero's attorney asserted in his opening statement that "you won't hear anyone that's going to say that Richard Guerrero was the shot caller that called for this shooting."

In the midst of trial, during the prosecution's case-in-chief, the prosecution informed the defense that Calzada would be testifying as a prosecution witness. The prosecutor intended "to ask him about his role in the shooting and the roles of the other

33

people who were involved in the shooting." "I believe he's not going to be forthcoming . . . ."

Calzada thereafter testified that he had pleaded guilty to voluntary manslaughter for the benefit of a criminal street gang for the shooting of Resendez and was serving a 21-year prison sentence. Calzada admitted that he was a member of VST. He testified that Guerrero's nickname was Sapo. He also testified that he was the only person who had shot at Resendez; Calzada denied that Lopez had even gotten out of the car. The prosecutor asked Calzada if he recalled talking to Lopez "about a specific person that asked you to do this crime?" Calzada replied "I don't recall," as he did to many of the prosecutor's questions. The prosecutor asked Calzada: "Did Richard Guerrero pick you to commit this crime?" Calzada replied: "Not at all."

During a break in Calzada's testimony, the court ruled that Calzada's "I do not remember" responses were "a refusal to answer" rather than "a failure of recollection" such that "anything he said on the same subject would be a prior inconsistent statement." The court ruled: "That leaves him wide open to any prior inconsistent statements he has made." The prosecutor then stated "I intend to impeach him with" his prior recorded inconsistent statements. Guerrero's trial counsel asserted that the reference to Guerrero during the conversation between Calzada and Lopez was not a prior inconsistent statement because it was Lopez who mentioned Guerrero and Calzada merely responded to that statement. He did not object to Calzada's statements, but he did object to Lopez's statement. The court tentatively ruled that Lopez's statements could come in "only in the sense since they were given orders and not who, which is consistent with my previous ruling when we were talking about Mr. Lopez." "Mr. Calzada can be asked about Mr. Lopez's statement to him, Mr. Calzada, but only in the context of something that does not mention Mr. Guerrero by name."

34

Calzada then testified that he was "putting in work" when he shot at Resendez. He also admitted that Tadeo-Hernandez, a fellow VST member, was the driver of the Honda. Calzada now claimed that no one else was in the Honda other than himself and Tadeo-Hernandez; Lopez was not even there. When Guerrero's trial counsel cross examined Calzada, the following colloquy occurred: "Q. Did anybody beforehand suggest that you [shoot Resendez]? [¶] A. No. [¶] Q. Were you directed to go to Cape Cod Court and shoot Mr. Resendez? [¶] A. No. [¶] Q. Did anyone order you to do it? [¶] A. No. [¶] Q. Did Mr. Guerrero as far as you know have anything to do with the killing of Homer Resendez? [¶] A. No. [¶] Q. Are you sure? [¶] Q. Yes." On cross-examination by Lopez's trial counsel, Calzada reiterated that he was the only one who had fired shots at Resendez, and Lopez had not been present.

After cross-examination, the prosecutor asked for a hearing outside the presence of the jury. He argued that Guerrero's trial counsel's questioning of Calzada "opens the door" to the admission of Calzada's prior inconsistent statement made during the Calzada/Lopez recorded conversation. The prosecutor argued that Calzada's prior statements showed that he did "know" that Guerrero was responsible for the killing of Resendez. "Mr. Schwartz [(Guerrero's trial counsel)] asked a question he shouldn't have." Guerrero's trial counsel argued that nothing had changed, and the court should not change its ruling because the recorded statement remained "inadmissible hearsay." The court disagreed and granted the prosecutor's request: "I prohibited the People from going into this area because of the Rules of Evidence. If the defense chooses to raise the issue and I think it's some sort of tactical reason, then I can't allow the witness to just say what he wants and then stop talking about the same subject."

On redirect-examination, the prosecutor asked Calzada about his conversation with Lopez, but Calzada claimed that he did not remember what they had discussed. The following colloquy occurred on recross-examination by Guerrero's trial counsel: "Q.

35

Mr. Calzada, again you told us that it was your decision to do the shooting on Cape Cod Court that night? [¶] A. Yes. [¶] A. And it wasn't anybody else who suggested that to you? [¶] A. No. [¶] Q. Do you remember Mr. Lopez ever in the conversation that you had with him at the jail where you and he were together in a room where he said to you, well, why was anybody looking to us to do this? [¶] A. No, I don't remember. [¶] Q. Was anybody looking to you to do anything? [¶] A. No."

With the court's approval, the prosecutor then unredacted the recording of the Lopez/Calzada conversation so that the word "Sapo" would be included rather than redacted. The recording of the Lopez/Calzada conversation, including the word "Sapo," was subsequently played for the jury and admitted into evidence.

During the trial, the court instructed the jury: "[A] statement by a defendant can only be used against that particular defendant not against a co-defendant. So if the evidence is that Mr. Lopez said something to someone, that can only be considered by you in connection with the charges against Mr. Lopez. That is also true if Mr. Guerrero said something to someone. That can only be used by you in connection with your decision about the charges against Mr. Guerrero. [¶] That limitation applies to defendants only. It doesn't apply to, um, statements made by . . . somebody who used to be a defendant like Mr. Calzada. Those, um, statements that came into evidence are like any other piece of evidence . . . ." At the conclusion of the trial, the jury was instructed: "You have heard evidence of statements that a witness made before the trial. If you decide that the witness made those statements, you may use those statements in two ways: [¶] One, to evaluate whether the witness's testimony in court is believable; and [¶] Two, as evidence that the information in those earlier statements is true."

The prosecutor referenced the Lopez/Calzada conversation repeatedly in argument to the jury. "Israel Lopez would not talk about who to the police, about who told him to do this. But he was quite clear that he was asked. He and Miguel Calzada. Why did he

36

look to us to do this.  Who Sapo looked to to do this." "Mr. Lopez says, 'why do you look to us to do it?' [¶] Calzada, again, not necessarily paying attention, says, 'who'? [¶] Mr. Lopez says, 'Sapo'. [¶] Mr. Calzada didn't say 'who'. 'Huh'? 'What do you mean'? He says -- next line down -- 'because he knew'. [¶] You can't hear every word, but he knew we were the ones around." "Prior statements as evidence. This is one of the most critical jury instructions you are going to see, especially as it relates to Miguel Calzada. [¶] You heard that Mr. Calzada, although denying, either not recalling or denying he made the statement on the stand, saying to Mr. Lopez in relation to Sapo looking to them because he knew we were the only ones around or we were the ones around in the discussion of why were they picked to do this killing. And you can use it in two ways, to evaluate his testimony here . . . but also as evidence that the information in the earlier statements is true. Direct evidence from Miguel Calzada against Mr. Guerrero in terms of his role in instigating, promoting, furthering, encouraging this crime. In fact, selecting the team, so to speak." "What are some of the things that show that Mr. Guerrero was the shot caller and therefore did put this in play? Mr. Calzada's response to the question about Sapo to Mr. Lopez." The prosecutor also replayed the video of this portion of the Lopez/Calzada conversation during his closing argument to the jury and told the jury: "The beef was right there. The video, that fourteen, fifteen seconds."

During deliberations, the jury asked for and received individual copies of the transcript of the Calzada/Lopez conversation. The jury also asked for a readback of Guerrero's testimony and Calzada's testimony.

### 2. Analysis

Guerrero maintains that his trial counsel was prejudicially deficient in opening the door to the admission of the highly inculpatory portion of the Lopez/Calzada conversation by asking Calzada: "Did Mr. Guerrero as far as you know have anything to do with the killing of Homer Resendez?" The Attorney General argues that the asking of

37

this question was a reasonable tactic by Guerrero's trial counsel aimed at "exploring the possibility that Calzad[a] and Lopez had made exculpatory statements in support of Guerrero's defense." She also claims that Guerrero's trial counsel's action was not prejudicial to Guerrero.

A claim of ineffective assistance of counsel may succeed on appeal only if the defendant demonstrates that his trial counsel's performance was deficient and that his defense was prejudiced by those deficiencies. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 218.) To show that his counsel was deficient, the defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." (*Strickland*, at p. 687.) "Judicial scrutiny of counsel's performance must be highly deferential. . . . [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" (*Strickland*, at p. 689.) Prejudice is shown by demonstrating "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694.)

We cannot accept the Attorney General's contention that Guerrero's trial counsel's question to Calzada could be considered a "'sound trial strategy.'" (*Strickland*, *supra*, 466 U.S. at p. 689.) Guerrero's trial counsel unceasingly sought throughout in limine motions and the trial to obtain and protect trial court rulings excluding the "Sapo" reference in the Lopez/Calzada conversation. At every turn, the prosecutor had mounted a strong and unrelenting effort to persuade the trial court to permit admission of that evidence. All of Guerrero's trial counsel's efforts in this regard had been successful—

38

until he asked this question of Calzada, which permitted the prosecution to introduce Calzada's prior inconsistent statement (Evid. Code, § 1235).[17] The record before us unambiguously demonstrates that Guerrero's trial counsel recognized the highly incriminating nature of this evidence and was determined to do everything in his power to prevent the jury from being exposed to it. Furthermore, the record plainly reflects that Guerrero's trial counsel was fully aware that the prosecutor was continuing to seek admission of this evidence while Calzada was testifying and was on the alert for any opportunity to persuade the trial court to change its mind about the admissibility of this evidence. The prosecutor had already sought admission of the Sapo reference as a prior inconsistent statement based on Calzada's testimony on direct examination.

In this context, it is not possible to conceive of any possible advantage that Guerrero's trial counsel could have hoped to gain by asking a question of Calzada that would plainly expose Guerrero to the admission of the Sapo reference. Guerrero's trial counsel asked Calzada: "Did Mr. Guerrero *as far as you know* have anything to do with the killing of Homer Resendez?" (Italics added.) If Calzada responded in the affirmative, his answer would implicate Guerrero in the killing of Resendez. If Calzada responded in the negative, his response would be inconsistent with his prior statement to Lopez in which he had acknowledged that Sapo asked them to kill Resendez. Since a negative response would trigger the admission of the Sapo reference in the Lopez/Calzada conversation as a prior inconsistent statement, no competent attorney would have risked asking this question. This is especially true because Calzada had already testified on direct examination that Guerrero had not asked him to kill Resendez. Under these circumstances, we are compelled to conclude that Guerrero's trial counsel

---

[17] "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770." (Evid. Code, § 1235.)

39

was deficient in asking this question and thereby opening the door to the admission of evidence that he had fought so hard to exclude.

We also reject the Attorney General's contention that Guerrero was not prejudiced by his trial counsel's deficiency. The Sapo reference during the Lopez/Calzada conversation was the strongest evidence that the prosecution could muster to support its theory that Guerrero was the shot caller who had directed Lopez to kill Resendez. This critical piece of evidence played a very prominent part in the prosecutor's argument to the jury that Guerrero had ordered the killing of Resendez. While there was a significant amount of other evidence implicating Guerrero, the other evidence was far more circumstantial. There was no evidence that Guerrero was present when Resendez was shot. The revolver Lopez had used to kill Resendez was found in Guerrero's home, but neither Guerrero's fingerprints nor his DNA were found on the revolver. In addition, there was evidence associating that revolver with Arcado, another VST gang member who had been staying at Guerrero's home. Guerrero's interaction with Hernandez suggested that Guerrero was part of the VST leadership, but it did not directly implicate Guerrero in the killing of Resendez. Lopez and Calzada both told the police that Guerrero was not involved in the killing of Resendez.

On this record, we conclude "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at p. 694.) Consequently, we will reverse as to Guerrero.

### F. Errors in Abstracts

At the sentencing hearing, the trial court imposed restitution on Lopez and Guerrero "jointly and severally" with each other and with Tadeo-Hernandez and Calzada. The restitution orders are consistent with the court's oral pronouncements. Lopez and Guerrero also were each ordered to pay a $10,000 restitution fine, a suspended $10,000

40

parole revocation restitution fine, a court security fee of $90, a criminal conviction assessment fee of $90, and a booking fee of $129.75. There are two abstracts of judgment for each defendant because each of them received both a determinate sentence and an indeterminate sentence. All of these fines and fees are listed on both abstracts for both defendants. The abstracts do not reflect that the restitution was imposed "jointly and severally."

Lopez and Guerrero assert, and the Attorney General concedes, that the abstracts must be corrected to reflect that (1) the restitution was imposed "jointly and severally" among the four defendants, as stated in the restitution orders and at the sentencing hearing, and (2) the fines and fees imposed on each defendant should not be imposed twice but just once on each defendant. We accept the concession, and we will order that the abstracts be corrected as to Lopez. Since we reverse the judgment as to Guerrero, we will presume that, should he be convicted upon retrial, an accurate abstract will be produced.

## IV. Disposition

The judgment as to Lopez is affirmed. The trial court is directed to correct the abstracts of judgment as to Lopez to reflect that the restitution was imposed "jointly and severally" with his codefendants and that the fines and fees were imposed only once, not twice. The judgment as to Guerrero is reversed.

_____

Mihara, J.

WE CONCUR:


_____

Bamattre-Manoukian, Acting P. J.


_____

Márquez, J.